NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10405

COMMONWEALTH  vs.  FRANCIS LANG.[*]


Suffolk.    November 7, 2014. - October 1, 2015.

Present:  Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.


Homicide.  Constitutional Law, Public trial, Jury, Waiver of
    constitutional rights, Assistance of counsel.  Jury and
    Jurors.  Practice, Criminal, Capital case, Empanelment of
    jury, Public trial, Waiver, Instructions to jury,
    Assistance of counsel.  Mental Impairment.



    Indictment found and returned in the Superior Court
Department on May 11, 2005.

    The case was tried before Stephen E. Neel, J., and one
issue raised in a motion for a new trial, filed on May 6, 2009,
was heard by him; the remaining issue raised in that motion for
a new trial was heard by Patrick F. Brady, J., and a motion for
reconsideration was considered by him.


    Ruth Greenberg for the defendant.
    John P. Zanini, Assistant District Attorney (Edmond J.
Zabin, Assistant District Attorney, with him) for the
Commonwealth.
    Leslie W. O'Brien, for Richard M. Boucher, Jr., amicus
curiae, submitted a brief.

_____

    [*] This opinion, which was originally released on August 4,
2015, was temporarily withdrawn by the court and has been
republished -- Reporter.

BY THE COURT.  The defendant was convicted in 2006 of murder in the first degree on the theory of extreme atrocity or cruelty.  While his direct appeal was pending here, he moved for a new trial on two grounds:  first, he claimed that the court room was improperly closed to the public during the jury selection phase of the case; second, he claimed that his trial counsel was ineffective in failing to investigate his mental history, thereby depriving him of, among other things, an opportunity to make an informed decision whether to pursue a defense of lack of criminal responsibility.  We transferred the motion for a new trial to the Superior Court and stayed the direct appeal pending a ruling on the motion.  After two separate evidentiary hearings, one on each of the issues raised in the motion, the motion for a new trial was denied.[1]

We now have before us the defendant's direct appeal and his appeal from the denial of his motion for a new trial.  In addition to pressing the public trial and ineffective assistance of counsel claims raised in his motion, the defendant also challenges the judge's charge to the jury, claiming that it was

---

[1] By agreement of the parties, the two issues raised in the motion for a new trial were considered separately.  The trial judge heard and decided the portion of the motion raising the public trial issue.  Subsequently, and after the trial judge had retired, another judge of the Superior Court heard and decided the portion of the motion raising the ineffective assistance of counsel claim.

error to instruct the jury that they could find malice for purposes of murder in the first degree on the theory of extreme atrocity or cruelty based on the so-called second or third prong of malice, and, further, that the third prong of malice is essentially indistinguishable from the mens rea needed for a conviction of involuntary manslaughter.

All five Justices on the quorum agree that the judgment of conviction and the orders denying the motion for a new trial are to be affirmed.  With respect to the public trial and jury instruction issues, the Justices unanimously reject the defendant's claims for the reasons set forth in parts 2.a and 2.b of Justice Hines's concurring opinion, post at   - (Hines, J., concurring).  With respect to the claim that counsel was ineffective in failing to investigate the defendant's mental history, the Justices unanimously agree that the defendant is not entitled to relief on that basis, but they reach this conclusion for differing reasons.  Two Justices -- Justice Hines and Justice Duffly -- conclude that the failure to investigate did not create a substantial likelihood of a miscarriage of justice in the circumstances of this case because, "even assuming the availability of a viable lack of criminal responsibility defense, counsel's strategic choice to defend the case solely on a self-defense theory was not manifestly unreasonable."  Id. at   .  The other three Justices on the

quorum -- Justice Lenk, joined by Chief Justice Gants and Justice Cordy -- conclude that the failure to investigate did not create a substantial likelihood of a miscarriage of justice because the defendant "offered no evidence indicating that he would have agreed to present a lack of criminal responsibility defense at the time of the original trial, and has clearly asserted that he would not present the defense at a new trial," and because "the absence of any evidence indicating his willingness to present the defense prevents him from establishing prejudice as a result of counsel's failure to investigate such a defense." Post at     (Lenk, J., concurring). These Justices are also of the view that, "[e]ven if the defendant had agreed to present a lack of criminal responsibility defense . . . [it is questionable] whether [it] would have been a substantial defense and . . . [there is] no reasonable basis for thinking the outcome at trial likely would have been different." Id. at   .

Finally, after review of the entire record pursuant to G. L. c. 278, § 33E, the Justices agree unanimously that there is no other basis for granting the defendant relief.

Judgment affirmed.

Orders denying motion for
a new trial affirmed.

HINES, J. (concurring, with whom Duffly, J., joins).  1. Background.  The jury could have found the following facts. Shortly before midnight on March 18, 2005, the defendant, Francis Lang, with a can of beer in hand, entered a bar in the Charlestown section of Boston.  Because of an incident several years prior, the defendant had been banned from the bar by the bartender who was on duty when the defendant arrived.  The bartender and his sister, a waitress at the bar, were the only employees working that night.

The defendant approached the bartender and asked for a beer.  The bartender reminded the defendant that he was not welcome at the establishment.[1]  The defendant protested, stating that a long time had passed and he was a "different person." The bartender repeated that the defendant was not welcome. Growing upset, the defendant told the bartender that he had better contact the police and "have them take me out because I am not leaving."  As the bartender headed over to a telephone behind the bar, the defendant started yelling obscenities.

The bartender's sister, her boy friend, and the victim, Richard T. Dever,[2] went over to the defendant.  The defendant apologized to the bartender's sister.  Someone asked the

---

[1] The defendant had an odor of alcohol on his breath and was slurring his words.

[2] The victim was at the bar with the bartender's sister's boy friend; they were friends.

defendant to leave and tried to usher him to the front door. Although he started to comply with their requests to leave, the defendant threw his beer can, smashing a glass object at the bar, and said, "Fuck you," to the bartender.

Accounts by patrons inside the bar varied as to what next ensued, but there was evidence that a scuffle occurred in the small foyer at the entrance of the bar involving the defendant and the victim, and possibly others. One witness testified that the victim threw punches at the defendant. The scuffle moved outside onto the sidewalk in front of the bar. There, the defendant and the victim exchanged punches. The defendant took out a pocket knife and stabbed the victim several times, stating, "How do you like that, motherfucker?" and, "How's your motherfucking pretty face now?" The defendant "gave the finger" and left. Minutes later, he returned to the bar briefly, yelling and looking for his glasses. He then fled the scene. Several hours later, the police found the defendant hiding in a basement apartment at a home in the area and arrested him.

After the altercation, the victim, with the assistance of his friend, returned inside the bar. The victim had blood all over his face from a gash inflicted during the stabbing. His shirt was torn open revealing blood on his chest. After stopping briefly at the back of the bar to sit down, the victim was brought to a room out of sight behind the bar. Someone

screamed, "Call an ambulance." The bartender made the call, and police officers and paramedics arrived within minutes. They found the victim covered in blood and gasping for air. Paramedics transported the victim to a nearby hospital where he was pronounced dead in the early morning hours of the following day.

The victim died as a result of multiple stab wounds. He suffered three stab wounds to the left side of his chest, one of which perforated his heart, and one stab wound under his arm. Also, as a result of the attack, the victim had three incised wounds on his face, one of which exposed bone.[3]

The defendant did not testify. He called one witness, a patron at the bar. The patron stated that before the stabbing, the defendant had been physically attacked by four people. Based on this witness's testimony, the defendant's trial counsel argued that the defendant had acted in self-defense.

---

[3] We have noted the distinction between stab and incised wounds in prior murder cases. See, e.g., Commonwealth v. Vacher, 469 Mass. 425, 427 n.3 (2014); Commonwealth v. Chambers, 465 Mass. 520, 524 (2013); Commonwealth v. Vasquez, 462 Mass. 827, 832 (2012). As understood in the forensic pathology community, "a stab wound is a wound from a cutting instrument that is deeper than [its surface length], whereas an incised wound . . . is a sharp force injury where the length on the surface is longer than the depth." Commonwealth v. Phillips, 452 Mass. 617, 622 (2008). The medical examiner in this case testified consistent with this understanding: "an incised injury is more of a long cut on the skin; a stabbing injury is usually smaller on the skin surface where the sharp instrument is pushed in."

Alternatively, the defendant's trial counsel asserted that mitigating circumstances rendered the killing nothing more than voluntary manslaughter.

In addition to instructing the jury on murder in the first degree, the judge instructed on murder in the second degree and on voluntary manslaughter based on excessive force in self-defense, heat of passion on reasonable provocation, and heat of passion induced by sudden combat. He also instructed on self-defense and on the effect of a defendant's alcohol intoxication on intent.

2. Discussion. a. Public trial. In 2009, the defendant moved for a new trial,[4] claiming a violation of his right to a public trial under the Sixth and Fourteenth Amendments to the United States Constitution when court officers excluded the public and his family from the court room during jury empanelment. The trial judge conducted an evidentiary hearing on the motion and issued written findings of fact summarized as follows.

Jury empanelment in the case took place during the course of two days. At the time of the defendant's trial in 2006, the generally accepted practice at the Suffolk County Court House in circumstances where the venire likely would require all

---

[4] The defendant's counsel on appeal, who also represented him on the motion for a new trial, was not his trial counsel.

available seats was for a court officer to instruct the public to leave until seats became available. If a family member or an interested citizen requested permission to remain in the court room during jury empanelment, a court officer would bring the request to the attention of the presiding judge, whose practice was to hear the request and to attempt to accommodate the individual. No such requests were brought to the judge's attention in this case.

On the first day of jury empanelment, the court room, initially, was filled to capacity with prospective jurors. As the empanelment proceeded that day, seats became available for persons other than prospective jurors. The day concluded at 4:30 P.M. On the second day, there may have been extra seats in the court room from the outset, and certainly were at some point that morning before jury empanelment was completed at 12:30 P.M.

Before commencing jury empanelment on the first day, the court officer in charge of the prospective jurors instructed the defendant's sister and her party[5] to leave the court room because

---

[5] The defendant's sister stated that her mother and boy friend were with her that day. The defendant's mother submitted an affidavit in conjunction with the motion for a new trial, but did not testify at the evidentiary hearing in support of the motion. The judge expressly discredited the entirety of the defendant's mother's affidavit. The judge, however, found that the defendant's sister and one other person, either the defendant's sister's boy friend or mother, had been present at the court room on the first morning of jury empanelment.

the seats were needed for prospective jurors.[6]  The defendant's sister asked if they could remain because they "were a little afraid of the other people waiting outside."  The court officer responded that they had to leave so there would be room for the prospective jurors.

The defendant's sister and her party left the court room and sat on a bench in a hallway.  They remained there for the rest of jury empanelment, and at no time did the defendant's sister return to the court room to see whether seats had become available or to ask any of the three attending court officers whether seats had opened up.[7]

During jury empanelment, none of the three court officers told anyone that the court room was "closed."  They did not lock the doors to the court room, and they did not post a sign or officer at the doors to the court room to prevent anyone from entering.

During trial, the defendant was represented by experienced counsel.  The defendant's trial counsel was aware of the defendant's right to a public trial.  Defense counsel, however, did not object to what he believed to be the "acceptable common

---

[6] There was no evidence that any other members of the public also were inside the court room.

[7] The judge found that the defendant's sister had discussed with the defendant during trial the fact that she had been asked to leave the court room before the prospective jurors were escorted in.

practice" of excluding the public during jury empanelment when the court room was filled with prospective jurors with no room remaining for the public. Although he had no specific memory in the defendant's case (except that there were more prospective jurors in the court room than seats available), the defendant's trial counsel often would tell members of a defendant's family that empanelment may be boring.

The judge concluded that the defendant had not satisfied his burden of showing that, during the jury selection process, the court room was closed in any but a trivial or de minimis way. He also determined that even if the court room were found to have been partially closed, the record established that the closure was not unconstitutional. There was no error.

The Sixth Amendment guarantees all criminal defendants "the right to a speedy and public trial." See Waller v. Georgia, 467 U.S. 39, 46 (1984). In limited circumstances, a judge may bar spectators from portions of a criminal trial. Commonwealth v. Martin, 417 Mass. 187, 194 (1994). To do so, however, a judge must make a case-specific determination that closure is necessary, satisfying four requirements: "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and

[4] it must make findings adequate to support the closure." Id., quoting Waller, supra at 48.

"The right to a public trial extends to the jury selection process." Commonwealth v. Morganti, 467 Mass. 96, 101, cert. denied, 135 S. Ct. 356 (2014), and cases cited. "Conducting jury selection in open court permits members of the public to observe trial proceedings and promotes fairness in the judicial system." Commonwealth v. Lavoie, 464 Mass. 83, 86, cert. denied, 133 S. Ct. 2356 (2013). Where closure during jury empanelment occurs over a defendant's objection, the requirements set forth in Waller, supra, must be satisfied to avoid violating a defendant's right to a public trial. Commonwealth v. Cohen (No. 1), 456 Mass. 94, 95, 107 (2010).

"It is well settled that the violation of a defendant's right to a public trial is structural error requiring reversal." Commonwealth v. Wall, 469 Mass. 652, 672 (2014). "However, even structural error 'is subject to the doctrine of waiver.'" Id., supra, quoting Commonwealth v. Cohen (No. 1), 456 Mass. at 106. "A defendant need not consent personally to the waiver of his right to a public trial; trial counsel may waive the right to a public trial as a tactical decision without the defendant's express consent." Commonwealth v. Wall, supra, citing Commonwealth v. Lavoie, 464 Mass. at 88-89. "Further, the right to a public trial may be procedurally waived whenever a litigant

fails to make a timely objection to an error."  Commonwealth v. Wall, supra, citing Commonwealth v. Morganti, 467 Mass. at 102. "A procedural waiver may occur where the failure to object is inadvertent."  Commonwealth v. Wall, supra at 672-673, citing Commonwealth v. Morganti, supra.

Our recent cases concerning waiver apply here.  As in Commonwealth v. Alebord, 467 Mass. 106, 108, 113, cert. denied, 134 S. Ct. 2830 (2014), the defendant here waived his right to a public trial "where his experienced trial counsel was aware that the court room was routinely closed to spectators during the jury empanelment process and did not object" at trial to the partial closure.  The defendant did not need to consent to the waiver itself; his counsel could effectuate the waiver and did. See Commonwealth v. Morganti, 467 Mass. at 102.  Nor was his trial counsel, in the circumstances, ineffective for failing to object to the closure.  See Commonwealth v. Alebord, supra at 114; Commonwealth v. Morganti, supra at 104-105.

b.  Jury instructions.  The defendant argues error in the judge's instructions on extreme atrocity or cruelty based on second and third prong malice.[8]  To prove malice required for a murder committed on a theory of extreme atrocity or cruelty,

---

[8] The Commonwealth also proceeded against the defendant on the theory of deliberate premeditation, but the jury did not find him guilty on that theory.

"the Commonwealth must prove one of three prongs:  (1) intent to kill the victim; (2) intent to cause grievous bodily harm to the victim; or (3) commission of an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood of death."  Commonwealth v. Riley, 467 Mass. 799, 821-822 (2014).  See Commonwealth v. Grey, 399 Mass. 469, 470 n.1 (1987).  Specifically, the defendant, relying on the concurring opinion in Commonwealth v. Riley, supra, argues that we should alter our definition of malice by abrogating second or third prong malice because those prongs do not require an intent to kill.[9],[10]  We decline the invitation to do so here.  The judge's instructions to the jury in this case were in accord with our common law of murder and followed our Model Jury Instructions on Homicide 12 (1999), which applied at the time of trial.

---

[9] The defendant objected to the charge below on these grounds, so the issue is preserved.

[10] The concurrence suggested that, "before a conviction of murder may be elevated to murder in the first degree based on extreme atrocity or cruelty," Commonwealth v. Riley, 467 Mass. 799, 829 (2014) (Duffly, J., concurring), a jury should be required to find that "the defendant either intended to cause an extremely atrocious or cruel death or was indifferent to such a result."  Id.  The facts in Riley, however, took into account that "the jury apparently did not conclude that [the defendant] either intended to kill his daughter or to cause her grievous bodily harm."  Id. at 828.  The same cannot be said here.

We also reject the defendant's argument that third prong malice has "the same state of mind required for conviction of involuntary manslaughter," and that consequently his life sentence is a "disproportionate punishment." We have explained:

> "The difference between the elements of the third prong of malice and wanton and reckless conduct amounting to involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew. The risk for the purposes of third prong malice is that there was a plain and strong likelihood of death. . . . The risk that will satisfy the standard for wilful and wanton conduct amounting to involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.'"

Commonwealth v. Vizcarrondo, 427 Mass. 392, 396 (1998), quoting Commonwealth v. Sires, 413 Mass. 292, 303-304 n.14 (1992). The standards are not synonymous.

c. Ineffective assistance of counsel. The defendant argues that the motion judge[11] erroneously denied his motion for a new trial based on his trial counsel's failure to investigate and pursue a defense of lack of criminal responsibility under the standards set forth in Commonwealth v. McHoul, 352 Mass. 544, 546-547 (1967). There was no error in the judge's ruling on the motion, although, as explained below, I would affirm on grounds different from those stated by the judge.

---

[11] Because the trial judge had retired, a different judge heard and decided the ineffective assistance of counsel issue. See ante at note 1.

In a written memorandum of decision and order, issued after an evidentiary hearing, the judge made the following findings of fact.[12] Twenty-two days before the victim was killed, the defendant had been released from Federal prison, where he had been serving time for a conviction of being a felon in possession of ammunition. Before the killing, the defendant had spent much of his adult life in prison.

The defendant's trial counsel is a very able, experienced, and highly regarded defense attorney. He has practiced criminal law since he was admitted to the bar in 1975 and has represented defendants in approximately fifty to one hundred murder cases. He was appointed by the court to represent the defendant in this case.

When the defendant's trial counsel met with the defendant about his case, the defendant informed him that he had a psychiatric history. Predecessor counsel had filed a motion for a motion for funds to screen the defendant for mental illness, but had not pursued it. Although the defendant mentioned his psychiatric history to his trial counsel, the defendant did not express any particular interest in pursuing a mental health

---

[12] The judge based his findings on the testimony of the defendant's trial counsel; the defendant's retained psychologist, Dr. Paul Spiers; and a psychologist retained by the Commonwealth, Dr. Tali K. Walters.

defense at trial.[13]  The defendant's explanation to his trial counsel concerning his conduct at the time of the killing was that he was attacked by several patrons of the bar and was defending himself.  His trial counsel believed that this defense was viable in that it was supported by at least one independent witness.  At trial, the defendant's claim of self-defense was supported by the testimony of one patron from the bar.

The defendant's trial counsel did not review the defendant's psychiatric history, consult with a mental health expert, or discuss the possibility of a defense of lack of criminal responsibility with the defendant, although defense counsel was familiar with this defense and had utilized it previously on behalf of other clients.  The defendant's trial counsel held a firm belief that this defense was rarely successful and should be raised only as a last resort and where no other viable defenses exist.  In his view, the inherent difficulty of a lack of criminal responsibility defense, coupled with the availability of a viable defense of self-defense, obviated the necessity of any action on the issue of the defendant's criminal responsibility.

---

[13] The judge found that the defendant, in his posttrial interview with the Commonwealth's expert, stated his opposition to any suggestion of pursuing a lack of criminal responsibility defense.

To support the defendant's motion for a new trial, Dr. Paul A. Spiers, a neuropsychologist, examined the defendant and prepared an affidavit. Dr. Spiers met with the defendant, performed tests, and reviewed the defendant's psychiatric history. In Dr. Spiers's opinion, the defendant was not criminally responsible for killing the victim because, at the time of the stabbing, the defendant did not appreciate the wrongfulness of his conduct and could not conform his conduct to the requirements of the law. In reaching his opinion, Dr. Spiers explained that the defendant suffered from a variety of mental disorders, including attention deficit hyperactivity disorder, learning disabilities, anxiety, seizure disorder, opposition-defiant disorder, bipolar disorder, and frontal network dysfunction.[14] In 2001, while being evaluated in Federal prison for competency to stand trial, the defendant was diagnosed with bipolar disorder, and since then has been prescribed numerous medications for that condition, and for his anxiety and seizure disorder. On a number of occasions, mental health professionals who examined him in prison described the defendant's behavior as impulsive and noted that he was not able

---

[14] Testing revealed that the defendant had an intelligence quotient (IQ) in an extremely low and defective range. The expert testimony was that the defendant's IQ was the equivalent of a person whom experts in the field previously labeled as "mentally retarded."

to control his behavior. When Dr. Spiers interviewed him, the defendant insisted, as he had to his trial counsel and to the Commonwealth's expert, that he had acted in self-defense. There is no evidence that the defendant ever suffered from visual or auditory hallucinations or thought disorder.

The Commonwealth's expert, Dr. Tali K. Walters, a forensic psychologist, conducted a three-hour interview of the defendant on September 16, 2011, and reviewed all of his psychiatric records and relevant portions of the case investigation file. Based on her examination and review of the records mentioned above, she opined that the defendant was criminally responsible for his actions at the time of the killing. She based her opinion on a number of factors, including that there appeared to be no evidence in the twenty-two days before the crime, after the defendant's release from Federal prison, of him suffering from any symptoms of mental illness. The defendant had not taken his medications with him from the prison, and had been without them for the duration preceding the crime, but Dr. Walters explained that the return of symptoms "takes weeks to months, sometimes years." Dr. Walters added that, in the defendant's case, it did not appear that his symptoms had returned prior to the murder. Nor, according to Dr. Walters, did the defendant experience symptoms of bipolar disorder or any

other mental illness during the first seven months following his arrest and incarceration for the victim's murder.

Applying the standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), the judge denied the defendant's motion. In doing so, he rejected the defendant's contention that defense counsel is obligated to investigate a defense of lack of criminal responsibility "in all cases in which a defendant may have a psychiatric background." The judge concluded that defense counsel's opinion that such a defense is one of last resort to be used where no other viable defense exists was not unreasonable, as it is a view "shared by other criminal defense attorneys." The judge concluded as well that counsel ably represented the defendant in presenting a viable defense, self-defense. The judge drew on his experience as a trial judge in murder cases, noting in his decision that "insanity verdicts are rare, even when . . . there is strong evidence of mental illness or bizarre human conduct," Commonwealth v. Walker, 443 Mass. 213, 226 n.2 (2005). Last, the judge determined that presenting a defense of lack of criminal responsibility would have undermined or been inconsistent with self-defense and would not have accomplished anything material for the defendant, who had made it clear in postconviction interviews that he did not want to use such a defense in the event he was granted a new trial.

In reviewing claims of ineffective assistance of counsel in a defendant's appeal of a conviction of murder in the first degree, we "determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to the defendant than is the general constitutional standard for determining ineffective assistance of counsel." Commonwealth v. Frank, 433 Mass. 185, 187 (2001). See Commonwealth v. Wright, 411 Mass. 678, 682 (1992). The inquiry is "whether there was an error in the course of trial (by defense counsel, the prosecutor, or the judge), and, if there was, whether that error was likely to have influenced the jury's conclusion." Id. "Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not 'constitute conduct falling "measurably below" that of an "ordinary fallible lawyer."'" Commonwealth v. Williams, 453 Mass. 203, 205 (2009), quoting Commonwealth v. MacKenzie, 413 Mass. 498, 517 (1992).

In this case, defense counsel made a strategic decision, without investigation or discussion with the defendant, not to pursue or to investigate a defense of lack of criminal responsibility (or other psychiatric defense). This decision was based on his knowledge of the extreme rarity of verdicts of not guilty by reason of insanity, and on his significant experience in the trial of murder cases that pursuing and

focusing on any other viable defense is the better course of action.[15] Where, as here, the defendant's ineffective assistance claim is based on a tactical or strategic decision, the test is whether the decision was "manifestly unreasonable" when made. Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006), quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978). "[S]trategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitation on investigation." Commonwealth v. Baker, 440 Mass. 519, 529 (2003), quoting

---

[15] At the evidentiary hearing on the motion, the defendant's trial counsel explained:

"I think it's difficult to defend on a series of fallback position[s], you know, my [client] didn't do it. If he did, it was self-defense. If you don't buy that, he was crazy. I think you dilute your chances of winning if you throw up a series of defenses. . . . It depends on the specifics of [each] case and what my goal is in the case, what I think is realistic. I think you try cases -- there are two different kinds of cases to be tried. One where you actually think you have a chance of winning, and one where you don't believe you actually have a chance of winning. And I think your strategic behavior is different in those two situations, and I would be much more likely to throw in the kitchen sink, so to speak, if I thought there was no chance of winning period. . . . [I]f you think that you really do have a chance of winning, then you want to maximize that chance by not throwing in the kitchen sink, by focusing on what is . . . really at issue and not having a strategy that goes in two different directions."

The defendant's trial counsel testified that he believed that in this case, the defense of self-defense was a potentially winning argument.

Strickland v. Washington, 466 U.S. 668, 690-691 (1984).  I conclude that the standard for constitutionally effective assistance of counsel is not met where defense counsel, as a matter of practice, declines to investigate or otherwise consider the defendant's mental condition in circumstances where an alternative viable defense is available.  Regardless of the strategic choice of a defense, counsel must engage in a rational calculation of the need for and scope of an evaluation of the defendant's mental condition.

We previously have held that the "[f]ailure to investigate an insanity defense falls below the level of competence" demanded of an attorney "if facts known to, or accessible to, trial counsel raised a reasonable doubt as to the defendant's mental condition."  Commonwealth v. Roberio, 428 Mass. 278, 279-280 (1998), quoting Commonwealth v. Doucette, 391 Mass. 443, 458-459 (1984).  Here, it is undisputed that the defendant had a psychiatric history and that defense counsel was aware of that history.  The defendant revealed to defense counsel some aspects of his psychiatric history, which counsel described as "significant."  In addition, defense counsel was aware that predecessor counsel had sought funds for a social worker to develop a "social history [of the defendant] and screen for mental illness."  This information was sufficient to trigger an obligation to at least consider an investigation of the

defendant's mental condition.  Here, however, counsel acknowledged a failure even to consider an investigation, explaining that he categorically rejects a lack of criminal responsibility defense, regardless of its merits, if any other defense is available.[16]  The failure to do so, given the available information suggesting that the defendant had a substantial psychiatric history, did not meet this standard.

I do not believe that counsel is obligated to pursue a full scale mental evaluation in every case where the facts or the defendant's background suggest only a hint of a mental issue.  I conclude, however, that where counsel is aware of information that may call into question the defendant's criminal responsibility, he must first make a reasoned choice whether further investigation is warranted.  In this regard, I emphasize the distinction between the facts of this case and Commonwealth v. Kolenovic, 471 Mass. 664 (2015), where we declined to impose on counsel a duty to investigate further the defendant's mental condition.  In Kolenovic, supra at 669-670, 678, counsel arranged a preliminary psychiatric evaluation, but made an informed strategic decision not to pursue the matter further.

---

[16] At the hearing on the motion for new trial, counsel testified as follows:  "I remember [that the defendant] mentioned [that] he had a significant psychiatric history [but] I was not that interested in a psychiatric defense.  And so, I wasn't pressing him and asking for details and engaging him in that conversation."

Counsel's failure in this case to take any steps to inform himself of the defendant's mental condition rendered this aspect of his representation ineffective.

As the defendant implicitly recognizes, a claim of ineffective assistance of counsel that focuses on counsel's asserted failure to investigate a lack of criminal responsibility defense is generally, and perhaps necessarily, linked to a claim that counsel was ineffective for not presenting a lack of criminal responsibility defense at trial. Thus, here, the defendant's ineffective assistance claim joins the two:  although he emphasizes counsel's failure to investigate his mental condition, he also claims that counsel's failure to present a "mental impairment" defense was deficient. A defense attorney's duty in this respect is to exercise a reasonable judgment in making the ultimate choice of the defense to be presented at the trial, taking into account the array of potentially viable defenses.

In my analysis of this issue, I assume, as the defendant argues, that Dr. Paul Spiers's expert opinion would have been available to counsel, if he had appropriately undertaken some investigation of the defendant's mental health history before trial.  The question then posed is whether, after failing to investigate a lack of criminal responsibility or mental impairment defense, counsel's decision not to present an

available defense on that basis also was ineffective.  Based on this record, I am persuaded that, even assuming the availability of a viable lack of criminal responsibility defense, counsel's strategic choice to defend the case solely on a self-defense theory was not manifestly unreasonable.[17]

This was not a case where defense counsel's strategic decision left the defendant without any defense at all, Commonwealth v. Haggerty, 400 Mass. 437, 441-442 (1987), and there is no suggestion in the record or by appellate counsel in argument that the alternative self-defense theory was not supported by the facts or that it was not presented competently by counsel.  In the absence of any record support for a conclusion that counsel irrationally pursued a defense that lacked viability, I would not disturb an otherwise reasonable strategic choice.  It was eminently reasonable to consider, regardless of the possibility of a favorable expert opinion that the defendant lacked criminal responsibility, the inherent difficulty in persuading a jury of the merits of that defense as

---

[17] As we have said, the more favorable standard of review articulated in Commonwealth v. Wright, 411 Mass. at 682, applies where the defendant has been convicted of murder in the first degree and asserts a claim of ineffective assistance of counsel. Notwithstanding the more limited deference to counsel when the defendant stands convicted of murder in the first degree, we may still rely on the manifestly unreasonable test in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), to evaluate the claimed inadequacy in counsel's performance.

a factor in the choice of a defense, and to reject this option in favor of a defense deemed to be more acceptable to a jury. See Commonwealth v. Spray, 467 Mass. 456, 473 (2014) ("a decision not to pursue an insanity defense for tactical reasons, for instance because in the circumstances the defense would be factually weak, is not tantamount to ineffective assistance of counsel"); Commonwealth v. Walker, 443 Mass. at 228 (affirming denial of motion for new trial in part based on fact that defense counsel's trial strategy of pursuing one defense, as opposed to multiple defenses, was not manifestly unreasonable, "especially where the mental health defense would have 'severely weakened' the defense of self-defense").  In addition, as the judge found, presenting both defenses would have been pragmatically (although not legally) inconsistent.  See Commonwealth v. Walker, 443 Mass. at 226 (although mental health defense and self-defense would not necessarily have been incompatible, mental impairment defense "likely would have an adverse impact on the claim of self-defense").

Applying the manifestly unreasonable test to counsel's decision to forgo a lack of criminal responsibility defense in the circumstances of this case, I cannot say that "lawyers of ordinary training and skill" would not consider his strategic choice to be competent.  Thus, I conclude that counsel's

decision to forgo a lack of criminal responsibility defense on this basis was not manifestly unreasonable.

Also, consistent with the view expressed in Commonwealth v. Kolenovic, 471 Mass. at 678, I add that counsel was not obligated to present a defense based on Dr. Spiers's expert opinion that the defendant suffered from a mental impairment at the time of the offense.  Because we have recognized that "a defendant's legal counsel is uniquely qualified to assess the nuances that attend the development of the trial strategy," counsel reasonably may decline to accept the advice of a retained expert.  Id.

Last, the defendant's reliance on Commonwealth v. Federici, 427 Mass. 740 (1998), to advance the argument that he was entitled to make the choice whether to present a mental impairment defense and that counsel's strategic decision not to do so constituted ineffective assistance of counsel, is misplaced.[18]  In Federici, supra at 743-744, we determined only that a defendant's choice to forgo an insanity defense is a

_____

[18] In Commonwealth v. Federici, 427 Mass. 740, 743-744 (1998), the defendant, at trial, personally opposed the judge's proposal to instruct the jury on lack of criminal responsibility, then argued on appeal that the judge erred in failing to give that instruction despite the defendant's objection.  We concluded that, "[i]n the circumstances, the judge had no obligation to do more and was entitled to rely on the defendant's refusal to present a defense of insanity."  Id. at 746.

constitutionally protected right. Our holding did not reach the issue whether the defendant has an affirmative right to decide, independently of counsel, to present that defense. Even if I were to accept that view, the defendant would gain nothing by it given the particular circumstances of this case. Contrary to the defendant in Federici, the defendant expressed no wish or choice on the subject of presenting or forgoing a lack of criminal responsibility defense, and did not attempt to make any decision on the matter. Also, as the record reflects, the defendant steadfastly maintains that he will not present a mental impairment defense even he is granted a new trial.[19]

The confluence of these factors persuades me that counsel's strategic decision to forgo a defense of lack of criminal responsibility was not manifestly unreasonable. Although I do not reach the issue of prejudice in my analysis, I discern no basis for concluding that counsel's strategic choices, even if erroneous, created a substantial likelihood of a miscarriage of justice where the evidence against the defendant was strong and

---

[19] The defendant forcefully expressed his resolve not to present a mental impairment defense at a new trial. In the interview with the Commonwealth's expert, the defendant stated: "No, I'm not going to do that, you mean insanity? . . . I'm not a retard. I just have mental health history. I don't want to go to Bridgewater. . . I know what it is to be NGI -- go to Bridgewater and be forced to take medication and all that stuff."

counsel ably defended the indictment.  *Commonwealth* v. *Wright*, 411 Mass. at 682.

LENK, J. (concurring, with whom Gants, C.J., and Cordy, J., join).  I agree with Justice Hines's conclusion that the defendant is not entitled to relief on his motion for a new trial based on ineffective assistance of counsel.  I disagree however, on the reasons for that conclusion.  Justice Hines rejects the defendant's motion because she determines that a hypothetical strategic decision, which defense counsel never actually made, was "not manifestly unreasonable."  Ante at    .  I believe that the "manifestly unreasonable" standard should apply only when we are assessing the strategic decisions that defense counsel actually made, and not imagined decisions that counsel could have made.

The familiar test for a defendant's entitlement to relief under G. L. c. 278, § 33E, set forth by this court in Commonwealth v. Wright, 411 Mass 678, 682 (1992), has two parts.  The court asks "[1] whether there was an error in the course of trial (by defense counsel, the prosecutor, or the judge), and, [2] if there was, whether that error was likely to have influenced the jury's conclusion."  Id.

Justice Hines concludes that defense counsel's "failure even to consider an investigation" into a potential lack of criminal responsibility defense, "given the available information suggesting that the defendant had a substantial psychiatric history, did not meet th[e] standard" for effective

assistance of counsel.  Ante at    .  I agree with that determination.  Then, however, instead of proceeding to the second part of the analysis and asking whether counsel's error was likely to have influenced the jury's conclusion, Justice Hines reconstructs a hypothetical choice that counsel might have made, had counsel completed an adequate investigation.  She "assume[s] . . . that Dr. Paul Spiers's expert opinion [that the defendant lacked criminal responsibility for the killing] would have been available to counsel, if he had appropriately undertaken some investigation of the defendant's mental health history before trial."  Ante at    .  Concluding that, "even assuming the availability of a viable lack of criminal responsibility defense, counsel's strategic choice to defend the case solely on a self-defense theory was not manifestly unreasonable," she concludes that the defendant's convictions should be affirmed.  Ante at    .

Our case law does not support this assessment of counsel's strategic decisions in isolation from his constitutionally inadequate investigation.  On the contrary, we have held that "strategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitation on investigation." Commonwealth v. Baker, 440 Mass. 519, 529 (2003), quoting Strickland v. Washington, 466 U.S. 668, 690-691 (1984).  In

making a judgment about whether the scope of an attorney's investigation met the constitutional standard of effectiveness, therefore, we are also invariably making a judgment about the reasonableness of the attorney's strategic choices: counsel's strategic choice here was unreasonable because it involved deciding against a defense that counsel had done nothing to investigate.

Furthermore, assessing defense counsel's strategic decision in isolation from the inadequate investigation violates the rule that we "evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. at 689. See Commonwealth v. Adams, 374 Mass. 722, 729 (1978) ("The test is not to be made with the advantage of hindsight"). Normally this rule operates to protect attorneys against the "distorting effects of hindsight," and to combat the temptation "to second-guess counsel's assistance after conviction or adverse sentence." Strickland v. Washington, supra. Yet I see no reason why it should not operate with the same force in cases like this one, where the defense attorney's strategic choice is unreasonable in light of the limited investigation on which it was based. Id.

Finally, because we are not assessing the strategic choice that counsel actually made, the "manifestly unreasonable" standard is inappropriate. Justice Hines states that, despite

the "more favorable standard of review" for convictions of murder in the first degree under G. L. c. 278, § 33E, "we may still rely on the manifestly unreasonable test in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), to evaluate the claimed inadequacy in counsel's performance." Ante at note 17. While I agree that the "manifestly unreasonable" standard remains applicable under § 33E review, that standard does not constitute the general standard against which to measure any "claimed inadequacy in counsel's performance." On the contrary, the "manifestly unreasonable" standard is a special standard that applies where the attorney's purportedly constitutionally ineffective conduct involved a strategic decision, rather than some other claimed inadequacy such as a lack of appropriate investigation or preparation by defense counsel. Commonwealth v. Martin, 427 Mass. 816, 822 (1998). We have emphasized that the "manifestly unreasonable" standard is highly deferential. Commonwealth v. Glover, 459 Mass. 836, 843 (2011). That deference reflects the recognition that the "distorting effects of hindsight," while always present in ineffective assistance of counsel claims, are especially severe where the court is assessing a trial strategy after it proved unsuccessful. See Strickland v. Washington, 466 U.S. at 689. See also Commonwealth v. Glover, supra.

The deference involved in the "manifestly unreasonable" standard only makes sense if we are assessing the strategic choice actually made by "fully informed [defense] counsel." Commonwealth v. Adams, 374 Mass. at 728. Had defense counsel here adequately investigated the defendant's psychiatric history and then decided to forgo a lack of criminal responsibility defense in favor of a self-defense theory, we would be hard pressed to find that strategic decision manifestly unreasonable. But that is not what happened. Instead, the choice that defense counsel actually made was to elect a defense without even investigating a lack of criminal responsibility defense. That strategic decision was manifestly unreasonable, and I see no reason why our assessment of its reasonableness should be any different simply because we can imagine a different lawyer who, after completing an adequate investigation into a lack of criminal responsibility defense, might have opted against it.

To say that the court should assess only the strategic decision that counsel actually made does not mean that we must close our eyes to the weakness of the lack of criminal responsibility defense that defense counsel failed to investigate. The second part of the § 33E analysis requires the court to ask "whether [the] error was likely to have influenced the jury's conclusion." Commonwealth v. Wright, 411 Mass. at 682. And whereas, in determining whether there was an error by

defense counsel, we "evaluate the conduct from counsel's perspective at the time," Strickland v. Washington, 466 U.S. at 689, the inquiry into whether the error was prejudicial, both under § 33E review and otherwise, is expressly hypothetical. Where the case comes to this court on § 33E review, we ask whether "we are substantially confident that, if the error had not been made, the jury verdict would have been the same." Commonwealth v. Spray, 467 Mass. 456, 472 (2014), quoting Commonwealth v. Sena, 429 Mass. 590, 595 (1999), S.C., 441 Mass. 822 (2004).

In this case, I conclude that the defendant cannot make that showing. The defendant has offered no evidence indicating that he would have agreed to present a lack of criminal responsibility defense at the time of the original trial, and has clearly asserted that he would not present the defense at a new trial. See Commonwealth v. Comita, 441 Mass. 86, 90 (2004). Because, under Commonwealth v. Federici, 427 Mass. 740, 744-745 (1998), the decision to present a lack of criminal responsibility defense lies solely with him, the absence of any evidence indicating his willingness to present the defense prevents him from establishing prejudice as a result of counsel's failure to investigate such a defense.[1]

---

[1] Even if the defendant had agreed to present a lack of criminal responsibility defense, I would still question whether

My disagreement with Justice Hines's analysis of this issue is not merely a technical quibble.  On the contrary, I believe that her expansion of the highly deferential "manifestly unreasonable" standard beyond our evaluation of strategic decisions that counsel actually made could have a significant impact upon other cases, where the defendant is able to show an error by counsel.  Under that approach, a defendant's ineffective assistance of counsel claim would fail whenever the court can imagine a hypothetical lawyer who could have made a considered strategic judgment to present the case in a certain

---

the failure to do so created a substantial likelihood of a miscarriage of justice.  Where a defendant moves for a new trial based on ineffective assistance of counsel in failing adequately to investigate a potential lack of criminal responsibility defense, the judge may not deny the motion based on the judge's own assessment of a potential expert's credibility or based on the general observation that juries routinely reject lack of criminal responsibility defenses.  See Commonwealth v. Roberio, 428 Mass. 278, 281 n.5 (1998).  Nevertheless, to prevail on such a motion, the defendant must establish that "counsel's failure to raise" a lack of criminal responsibility defense "was likely to have influenced the jury's conclusion," thus requiring some judicial assessment of the strength of the defense.  Id. at 281.

Here I question whether a lack of criminal responsibility defense would have been a substantial defense and see no reasonable basis for thinking the outcome at trial likely would have been different had the defense been offered.  I come to that view given the considerably less than compelling quality of the proposed lack of criminal responsibility defense as ultimately outlined by the defense expert and the diluting effect of such a defense on the viable self-defense claim actually presented at trial.  These considerations are, of course, the same factors that lead Justice Hines to determine that the hypothetical strategic choice to forgo an ineffective assistance of counsel defense was not manifestly unreasonable.

way, even if the court has already found that defense counsel's actual decision did not reflect such a considered strategic judgment.  That approach significantly diminishes the force of claims of ineffective assistance of counsel as protection against wrongful or unfair convictions.